### JONES *v.* DOSEY.

1. BOUNDARIES—EVIDENCE—ADMISSIBILITY—APPEAL AND ERROR.
   In ejectment, where the issue was as to the boundary line between two city lots, there was no reversible error in sustaining an objection to testimony by plaintiff's witness as to the location of a fence farther west and a certain corner post, on the ground that there was no showing that it was put there according to some authorized survey, where, after proof of former survey was made, plaintiff's witnesses were permitted to testify fully in reference thereto.

2. SAME—TRIAL—INSTRUCTIONS—PROPRIETY.
   Where the declaration alleged that defendant had expressed herself as satisfied with the line as claimed by plaintiff, and his counsel pressed that claim on cross-examination of defendant, an instruction to the jury that where contiguous owners of property agree upon a dis-

puted boundary line they are bound thereby, is not open to the objection that there was nothing in the case to justify such charge.

3. SAME—TRIAL—CREDIBILITY OF WITNESSES.
   Under the record, the jury was not bound to accept as true the testimony of plaintiff's expert witnesses.

4. SAME—NEW TRIAL—GREAT WEIGHT OF EVIDENCE.
   Verdict for defendant *held*, not against the great weight of the evidence.

Error to Ingham; Carr (Leland W.), J.    Submitted April 3, 1923.    (Docket No. 13.)    Decided October 1, 1923.

Ejectment by Albert A. Jones against Maria Dosey. Judgment for defendant.    Plaintiff brings error. Affirmed.

*George R. Heck* (*Jason E. Nichols*, of counsel), for appellant.

*C. W. & W. S. Foster* and *William S. Cameron*, for appellee.

STEERE, J.    This is an action in ejectment to recover a strip of land five feet wide lying adjacent to the rear line between lots 2 and 17 of block 1 of Morrison's subdivision in the city of Lansing.    The primary issue is whether it lies on the north or south side of the line, plaintiff being the owner of lot 2 and defendant of lot 17.    From an adverse judgment plaintiff seeks reversal on various assignments of error directed to rulings on admission and rejection of evidence, errors in the charge and refusal to grant a new trial.

As platted, block 1 of Morrison's subdivision contains 18 lots each 165 feet in length, extending north and south.    Lots numbered 1 to 9 inclusive front north on Main street and lots 10 to 18 inclusive

front south on Williams street. Lots 1 and 18 are the east lots of the block extending lengthwise along the street line of Division street which runs north and south. Lot 1 lies east of lot 2 and lot 18 east of 17. The rear line between lots 2 and 17 is a continuation of the rear line between lots 1 and 18, and so on west through the block. Plaintiff was born on lot 2 about 36 years before he began this suit and had acquired it from his mother in 1913. Defendant bought the north or rear halves of lots 17 and 18 in 1886 and has lived thereon since that time. Her last house, numbered 816 Division street, was built on lot 18 about 13 years before this litigation. A walk three feet wide extends along the north side of her house from Division street to its rear which she claims is six inches south of the dividing line between lots 1 and 2, on its north, and lots 17 and 18 on the south.

At the time plaintiff acquired title to lot 2 there were four houses on lot 1, that farthest south, fronting on Division street, being near the south end with a walk along its south side just north of the line, as claimed by defendant. As lots were sold and houses built from time to time several surveys were made to locate them. Defendant testified that she had her property surveyed and marked out by a surveyor named Bartholomew when she bought it, and his stakes were confirmed by subsequent surveys. A Mr. Church who bought lot 1 and built the four houses on it testified that in 1904 he had it surveyed, measured and stakes set by Bartholomew, who was a surveyor in Lansing for many years and for a time city engineer; that he assisted him in the work, kept his own notes and verified Bartholomew's survey from a government monument, and made a diagram from that data which showed it to be 3 feet and 8 inches from the north wall of defendant's house to the line between lots 1

224—Mich.—23.

and 18, and an equal distance from the south house he built on lot 1 to the line.

No trouble appears to have arisen between any of the owners or occupants of those closely adjacent houses in that neighborhood until after plaintiff purchased lot 2 and engaged a surveyor by the name of Robb to make a survey which placed the south line of his lot about 5 feet south of where Bartholomew located it, and if extended it would run through defendant's house, putting its north wall on lot 1.   Plaintiff built a fence up to the rear of defendant's house inclosing the 5-foot strip he claimed and she tore it down, after which he commenced this action.   The trial court submitted the question of true line between lots 2 and 17 to the jury, resulting in a verdict for defendant.

The full description of plaintiff's property is:

"Lot two (2) in block one (1) in Morrison's sub-division of block number sixteen (16) of.Townsend's subdivision of the north part of section number twenty (20) of township four (4) north, of range two (2) west, Ingham county, Michigan."

It appears that this "north part of section number twenty" consisted of an 80 acres of land, half a mile in length east and west, formerly owned by Isaac Townsend who in 1864 platted it into blocks as the Townsend subdivision.   A surveyor named Preston surveyed out the whole subdivision for him.   He sold block 16 to Morrison without subdividing it.   In 1866 Morrison subdivided the block into two blocks numbered 1 and 2 with Williams street running through the center east and west, and subdivided his two blocks into lots, naming his plat "Morrison's subdivision of block 16, of Townsend's subdivision," etc.

Under the heading "Argument" in their brief plaintiff's counsel first point out that defendant attempts to justify her claims to the five feet of land upon the

theory of a "stretched chain" used by the surveyor of the Townsend subdivision which put the northeast corner of block 16 too far south, and the "strip of land was either in Main street or should have been accounted for by the owners of lots adjoining Main street, being upon the north end of their lots." We find nothing in the record indicating any claim of defendant to five feet of plaintiff's lot. The theory of a stretched chain was advanced by plaintiff's witness Bateman, a surveyor whose survey of the lots placed the disputed line where plaintiff claimed. He testified that in the measurements made by Preston east and west, according to the plat.—

—"there is an overplus-of 9.2 feet, showing that his old link chain that he used must have been an old one and worn, making it three inches too long, practically. * * * and so in measuring from the center of St. Joe south to Isaac street we have approximately five feet too much land standard measure."

He also stated that in his work he used a steel tape of standard measure, which was "a measure of length gotten out by the United States government at a temperature of 65 degrees Fahrenheit," and that a standard measure meant a "perfect measure in survey language." Two other engineers who had made recent surveys of the line for plaintiff testified to its being where plaintiff claimed according to the Morrison plat, but apparently were also unable to reconcile it with the Townsend plat. Some of the efforts of those surveyors indicate a discrepancy showing in lot 16 an overplus of from three to five feet. Main street was in existence before Morrison's subdivision was platted.

Bateman said there was an overplus in that block according to the original survey owing as he thought to the worn or stretched chain used by the original surveyor. Upon the subject he was asked and answered:

"*Q.* And does Morrison's sub. reach into Main street?

"*A.* Not according to the recorded plat. I should say that the place where I placed the iron stake is in the center of block one (1), north and south, according to the original survey, that would give 165 feet in lot 2 and 165 feet in lot 17. There is a little surplus in there, but whether it belongs to you (Jones) or to the street I am not certain. * * *

"*Q.* In other words, there are two lots of 165 feet plus 5 feet and one inch over?

"*A.* Yes, sir. * * *

"*Q.* Then giving him (Jones) his 165 feet as called for by the plat, his fence is nearly 5 feet over to the south, isn't it?

"*A.* Yes. * * *

"*Q.* This monument in St. Joe?

"*A.* Original government monument.

"*Q.* Now, from there the platted distance from that monument to this iron stake at the corner of Main and Division shows this stake to be at the right place?

"*A.* That is right, yes, sir.

"*Q.* Is there any dispute about it?

"*A.* There is a question there that I don't know exactly how the original surveyors might have surveyed that out. * * *

"*Q.* And Mr. Jones asserts a claim to 165 feet plus nearly five feet standard measure?

"*A.* Standard measure, yes, sir. * * *

"*Q.* Then under your construction the whole part of our town up there is out of joint?

"*A.* On account of that original measure.

"*Q.* And if we start in and allow that as to lot 2 to correct it, every lot should be corrected, shouldn't it?

"*A.* If he had used the same chain both times. * * *

"*Q.* Let me put this question: The position which we take, Mr. Jones is on Miss Dosey's land, but you know that there is an overplus in there?

"*A.* Yes."

Surveyor Townsend testified there was no surplus, as did also surveyor Robb who located the line in dispute for plaintiff where the latter built his fence, but

he later took the stand and corrected or explained his former testimony to the effect that there was from the corner post of section 20

"an apparent difference there of several feet between the said measurement and our measurement and the original plat measurement.    *    *    *

"Q. So there would be a difference of nearly 5½ feet?

"A. Yes, sir.

"Q. And that is in the Townsend addition?

"A. Yes, sir."

Plaintiff and other witnesses he produced testified that there was formerly an old fence between lots 2 and 17 where he built the fence defendant removed, which was positively denied both by defendant and plaintiff's mother. The latter testified that she had lived on lot 2 for some 35 years, was there when plaintiff built her house and before "any houses were built that you have been talking about," and had a garden on the rear of lot 2 which was plowed up to the back line, while defendant's land was never plowed, saying in part:

"There was no middle fence, at least as to my lot, between lots 2 and 17. There was a ridge that indicated where the lot line was. * * * It is there today and right there is the line. There was no dispute as to the boundary line when I lived on lot 2. That ridge you can see right now. * * * That is at my south line. * * * The ridge is north of the Jones fence. If the ridge were extended it wouldn't cut into the Dosey house at all but would be north of it."

Although plaintiff was born on lot 2, and assumed to testify as to some things which happened there before he was born, he scarcely could have been there before his mother was, and the question of which had the most reliable recollection of early events was manifestly a question for the jury. It was shown without question that Bartholomew was a surveyor of many

years' experience who came to Lansing in an early day and worked at his calling here for near half a century, served the city as its engineer and was familiar "with every monument in it." He located defendant on her property, set the stakes of his survey, showed them to her, and did the same thing years later for Church. The surveyors whom plaintiff employed were latter day advents in the city with perhaps greater facilities for standard or "perfect" measurements but less actual knowledge of early conditions and landmarks than those who made the original surveys and platted the city. They testify to finding inaccuracies in the old surveys, and seem to disagree as to an overplus in that block. If plaintiff's expert witness Bateman is right plaintiff and defendant each have their full length lot of 165 feet, and there is yet an overplus somewhere. We do not discover any survey suggesting or claim made that there was any shortage. Plaintiff does not deny he has 165 feet without the five feet in dispute. When asked if he claimed more than 165 feet he replied, "No, sir, I claim ownership of lot number 2."

These two properties adjoining at right angles in the rear were respectively bought, taken possession of and occupied as residences by defendant and plaintiff's mother over 30 years ago with no question ever raised as to the dividing line between them as established by the Bartholomew survey. Both testify positively to the location of that line and their mutual recognition of it in the use and occupation of their properties during those years.

Plaintiff, without showing any shortage in his own lot, now claims the dividing line according to recent survey gives him this disputed five feet and defendant contends for the correctness of the Bartholomew survey made when she took possession, confirmed by practical location and recognition of the owners and

occupants during those many years. The following conclusions by Justice COOLEY in *Flynn* v. *Glenny,* 51 Mich. 580, based on a situation in many respects analogous are illuminating in this contention:

"It is seldom or never that a town plat in a new country is made with perfect accuracy; and it is familiar knowledge in this State, if not elsewhere, that any attempt to make street lines and lot lines correspond with mathematical accuracy to the recorded plat after the lots have been occupied and improved, would disturb possessions in the most serious manner, and lead to infinite difficulty and litigation. Fortunately the rules of law do not admit of this. Purchasers of town lots have a right to locate them according to the stakes which they find planted and recognized, and no subsequent survey can be allowed to unsettle their lines. The question afterwards is not whether the stakes were where they should have been in order to make them correspond with the lot lines as they should be if the platting were done with absolute accuracy, but it is whether they were planted by authority, and the lots were purchased and taken possession of in reliance upon them."

Plaintiff testified that "over farther west" there was evidence of what his attorney called "the McGuire Heathorn fence that was through there," and prejudicial error is urged on the court sustaining an objection to the following question as to it: "*Q.* And does that compare with the survey, where this corner post is set?" The court sustained the objection "because there is no showing whether they were put there according to some authorized survey."

This ruling was made early in the trial. Later, after proof of former survey had been introduced, witnesses called by plaintiff were permitted to testify fully as to where the "Heathorn fence" and "Heathorn post," set by Bartholomew, were with reference to the line plaintiff claimed.

It is further urged that the court erred in telling the jury that where contiguous owners of property agree

upon a disputed boundary line between their holdings they are bound by such agreement, because "there was nothing in this case to justify such charge." Plaintiff's declaration alleges that on August 14, 1920, defendant stated to plaintiff she was satisfied with the line where he had built the fence "and the line was mutually agreed to on that date." Upon the trial plaintiff's counsel pressed that claim in cross-examination of defendant. We are not persuaded, as apparently contended for by plaintiff, that the jury was bound to accept as true the testimony of his expert witnesses, or that the verdict was against the great weight of evidence.

The case was fully and fairly tried, and the issue of "the south line of plaintiff's lot" impartially submitted to the jury under a charge which made plain that issue and their duties in passing upon it.

The judgment will stand affirmed.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.